Good morning. May it please the court, my name is Phil Bachum. I'm here on behalf of the plaintiff's appellant. The plaintiff's appeal raises two issues. The first is that the district court applied the wrong legal standard to determining the defendant's liability. Essentially, the magistrate judge applied vicarious liability principles, even though the FCC has stated in prior binding rulings and in an amicus letter to the 11th Circuit that vicarious liability principles don't govern liability under the TCPA for junk faxing. And the second issue is that the district court improperly excluded the defendant's sworn interrogatory answer at the bench trial when the only issue was the issue that the magistrate judge carved out was the scope and volume of this guy's faxing. And we had asked him whether when he hired somebody to send the faxes, did he put any limitations on their scope in terms of area code or state? And he said not applicable. So we wanted to use the answer not applicable to say that you told us there weren't any in the past, now you're saying there are. And the judge thought that it was our burden to come in on a motion to compel a different answer than not applicable. We first got a judgment of $16,000, right? Yeah, well, the judge entered summary after certifying the class and sent notice. She granted summary judgment in favor of some of the class members, but found a triable issue in terms of how many faxes this guy wanted to send. Well, I think it was within the, I guess, the 10, what is it, 10 miles or 20 miles? He says 20 miles, 100 faxes within 20 miles. Those 32, some of them were, got two of them, were within that 20 miles, right? Correct. That's right. Even though the named party was from Chicago or someplace. Right. It's a nursing home in Chicago. This guy sells hearing aids. Is that still going? What's that? The one against, I don't know who that person is the party for, the class action. I mean, for the, what is it, 4,000? Well, that's, so on summary judgment, the magistrate judge entered judgment for a small portion of the class and sent the rest of the class, including the plaintiff, to trial and then ruled against the plaintiff and the rest of the class. I see. Okay. Now, what about the, what is it, what's the name of the, B2B? Oh, B2B is some, is a doing business name of some woman in the Bronx, in Brooklyn. You've got more than one case with two, three, B2, don't you? We have, yeah. How many? I don't know the answer, but maybe less than 100, but more than 50. I mean, this is amazing to me. It is. Is this just sort of routine, this B2B just sends out faxes all over the place and then you have this huge volume and then stick it to some person that may not have gone, know they're going that far? Well, B2B says that they didn't send them, they were sent by this Macaw SRL in Bucharest, Romania, which is what it says at the bottom of the fax. Oh, is that what it said? And at the bottom of this guy's fax that he approved, the content at the bottom says, the destination and content for this fax is owned and controlled only by this company in Romania. Oh, that's handy. Yeah, right, exactly. So we should go there because you get an ad from him about his hearing aids and you sue him and say, I never gave you permission and Congress made it illegal to send this to me. I use a little hearing aid here sometimes because I can't hear everybody as well as I should. Could Bridgeview also sue B2B? Does anything in the TCPA prevent a fax recipient from suing the entity who physically sent the fax when it did so beyond the authority of the true sender? Nothing prevents the plaintiff from suing the broadcaster. The broadcaster could have a defense. The FCC has said the advertiser is primarily liable, has direct liability, and that the broadcaster does not. But the broadcaster could be held liable based on the extent of their participation. But B2B's defense, because we've heard it in other cases, is that B2B didn't send any faxes. They were just the middleman for this Romanian company, Macaw. So I guess if we wanted to sue Macaw, we could do that. But we don't need to because we've sued the guy who, but for this guy's participation, but for him approving the advertisement and paying to have it sent by fax, there wouldn't be any illegal faxes. But in this case, what is it? 4,000 to 6,000, I don't know. Yeah, it was 6,000 attempts and less than 5,000 completed. Okay, so there's 5,000 completed. And so this guy that wanted to send it to somebody at 10, 20 miles, and now I don't know how far away they go, but probably all over the place. And so now he's, the way you look at it, he should be stuck for 5,000 times 500. Right, exactly. Well, he says that he only wanted, so here's his story, is that even though he had sent direct mail to people in his area for 5 cents a piece, his story in this case is that he paid $2.80 each for this company to send a fax to 100 different businesses in his area. And he had no input on who they sent them to, where they were going, why they were going there, but $2.80 each for a fax, even though he could send it by mail for a nickel. So that's the credibility thing that we get to at the end. That was a mistake. He paid that, I guess. Well, it just doesn't make any sense, does it? No. He did everything this company told him in writing, except he says he never saw any of the writings. So they sent him draft ads, and they said, pick one of these, and within minutes, we'll send thousands of them for you. He said, well, I never saw that first page. And at the end, he says he never saw the welcome aboard letter that tells him the amount that breaks it down. It's $5,000 plus an extra $1,000 plus an opt-out, gets you to $279.20. And when you send it back, send us a void check, put your customer number in the subject line, and write add okay on the form ad to send that back to us, and we'll start faxing. Well, he did all of that, but never saw the first page. So his story is he paid $279.80 for 100 faxes to people. You know, you seem to be advocating for strict liability. If we took your argument to its logical conclusion, if a competitor wanted to put affordable digital out of business, it could simply send thousands of unsolicited faxes advertising its service, right? I mean, I suppose that's true. The statute is strict liability. Courts have said that. The 11th Circuit has said it. There is no, I don't know of that ever happening. I've been doing these cases for about 10 years. I've never heard of anybody sabotaging their competitor with junk faxes. But it's possible. Yeah, but under your theory, affordable would then be liable for millions of dollars of statutory damages because the faxes advertise its goods or services. Can that really be what Congress intended? Well, the rule we're advocating is that if you approve an ad and hire somebody to send it, you're liable. Okay, and that's the rule of the 11th Circuit. Well, strict liability. I'm sorry, Your Honor. Strict liability? Yeah, it is strict liability. I mean, it's direct liability, it's strict liability. And if you, it's strict liability because if you do it on accident or negligently, it's $500 a fax. If you do it on purpose or willfully, the statute expressly says you can have treble damages. So negligent, and the FCC has cited binding, rulings that are binding on this court as well as the district court, that it's up to the guy who's advertising to control the broadcaster. If he had hired his wife to send the faxes and she accidentally sent them to $5,000 instead of the $100,000 he claims, he would be liable for all $5,000. Why is it different if he hires somebody else who probably, I don't know, maybe they would say, oh, we misunderstood. We thought he wanted $5,000. We told him at least twice in writing we'd be sending that many thousands, and he never said anything. And his contention is that he said something orally to some guy who was never deposed, never found, not sure who he works for, if he was employed by anybody. But just like your hypothetical of some evil competitor puts people out of businesses, it could also be that somebody sends thousands of faxes on purpose, and then when they're caught, they say, oh, I didn't mean to do that. I told somebody orally, not in writing, to only send a few, and they did it from Romania. And so if you have any beefs with that, go talk to them. And that's why the FCC decided primary, direct, strict liability is on the feet of the advertiser. Otherwise, the system can't work. If there's multiple people involved and they all can point at each other, and at the end of the day, nobody's at fault except the people who got the faxes. I mean, every single one of the faxes is illegal. The guy hired somebody only to do something illegal. He didn't have express consent to send any faxes. You know, another hypothetical would be what if he had a list of people who said, please send me your fax, and then he accidentally sent them to a different list. I've also never seen that happen, but that would be another hypothetical. And I don't know what the rule would be there, but the rule we're advocating is if you hire somebody to send illegal faxes and you approve the fax that they send, you're on the hook for however many they send, even if you supposedly told them to send less. Now, of course, the judge said Mr. Clark was a credible, unsophisticated person who had no idea of what it cost to send a fax. And I think you'll agree that it's very hard to overturn that kind of credibility determination on appeal. I would agree with that, except we think the plaintiff contends you don't get to that determination if you apply the right legal standard, which is the same one applied by the Sixth Circuit in Avio Al Pacino and by the Eleventh Circuit in Palm Beach v. Saris, also two cases involving B2B. You don't get the credibility. But if you're going to get the credibility, you're going to have a bench trial where the only issue is, did this guy put any limitations on the faxing? And you don't let the plaintiff cross-examine him with a sworn interrogatory answer that says, not applicable, when he was asked, did you put any limitations on it? And we put the transcripts in the record, but essentially the guy never had to answer the question. We weren't able to challenge his credibility. So the magistrate judge never actually assessed his credibility because she just decided what would be interesting to hear and what wouldn't be. Well, the judgment, of course. I'm sorry, Your Honor. No, you go ahead. I mean, to have a sworn interrogatory answer and to decide that you can't ask the guy what he meant by not applicable, when we asked you this, why did you say not applicable? You know, his lawyer argued, well, that was a follow-up to the prior question. But the prior question, they said, no, I didn't purchase a list. They didn't say not applicable. So the first question is, if you bought a list, tell us about the list. And he says, no, I didn't buy a list. The next one is, if you told somebody else to put a list together, what parameters did you give them? He says, not applicable. Does B-to-B do this? Just a minute, please. Does B-to-B do this? Is this a common act? You've mentioned you've had a lot of cases with this. Is that right, with B-to-B? We have had a lot of cases with B-to-B. I think B-to-B is out of business. There's other fax broadcasters that do the same thing. Well, they're out of business because most people don't fax anymore. No, they do. This is 2006, so there was more back then. But even now, doctors and pharmacies and medical places still, because of HIPAA, they can't do e-mail, so they're still getting faxes. And people who send faxes know who still gets them, and they still get them. Like every day, I have clients that send me 100 faxes, junk, travel, and life insurance. And it's all still happening. And what happens now is the broadcasters, we just got lucky and got this hard drive from B-to-B because this woman had kept these documents. Everybody else throws everything out. They have a document retention policy to destroy everything. That answers my question. You got this hard drive, so now you can follow it. And do they always go through Romania? Is that how they send it? Well, supposedly, if somebody in Romania is upgrading computers in her apartment. A whole lot of faxes go out. Yeah. And nobody really knows who in Romania is choosing where to send them. They just go. You know, like the plaintiff hears a nursing home. Somebody decided to send hearing aid ads to places of people who want to buy hearing aids. They could have sent 6,000 to every fax machine in the tightest little circle possible for this guy. Instead, somebody was trying to send his faxes to where they thought people wanted them, probably. I mean, why do you send it to a nursing home in Chicago? It's random. I suppose that makes sense. Well, the judgment was entered for the plaintiff. But the named plaintiff was outside that 20-mile radius. Right. And so didn't actually prevail. So if we were to affirm the district court's conclusion regarding the 20-mile radius, what would the amended judgment look like? I know on page 12 of your reply brief that you said you don't object to a remand to fix the judgment. But can you be more specific about what the final judgment ought to say in such a circumstance? Well, I'm not sure I understand the question. But if you're saying if this court doesn't reverse anything, what should the order be said? Yeah. I guess it wouldn't say anything different. No. On page 12 of the reply, you said you don't object to a remand to fix the judgment. I don't have it in front of me, but I thought I saw that. I don't see it on page 12 of our brief, Your Honor. But if we said something would be fixed on remand, it would be if this court thinks the judge applied the right standard, legal standard, and denied summary judgment on that basis properly, then we would ask to be remanded for a trial, where we could actually challenge the person's credibility with a sworn interrogatory answer. I don't remember it that way, I have to tell you. Pardon me? Okay, well. Sorry. I'll be able to figure it out, though. You have time to express yourself. I've reserved some time for rebuttal. Well, I will allow you some time. We used all 15 minutes. Oh, sorry, Your Honor. I had a fair number of questions, so I'll give you three minutes for rebuttal. Okay, thank you, Your Honor. All right. Mr. Laverette? Good morning. May it please the Court, my name is Vincent Laverette. I represent the defendant, Jerry Clark. First of all, with respect to the facts in this case, the plaintiff in its brief stated that it was not disputing the district court's factual findings. With respect to the welcome aboard letter that counsel referred to, the magistrate judge concluded that Mr. Clark testified that he did not receive the letter and also found that there was no evidence that B2B ever sent that letter. So, based upon those two facts, he never saw the welcome aboard letter. With respect to this case, it arises out of Business to Business' database, which Plaintiff's Counsel obtained in another case. They've used this database to basically file many, many lawsuits. This particular court has had at least three B2B cases before it, reliable money order period of Montessori and Chapman v. Wegner. In one of those opinions, this court indicated that it looked like there were over 100 cases that were filed based upon B2B databases. As Judge Rofner had indicated, the trial court found that Mr. Clark was not particularly sophisticated. He ran a small business. He sold and serviced hearing aids in and around the Terre Haute area. He was solicited by a person by the name of Kevin Wilson, who worked for B2B, and his instructions to Wilson were just send faxes within a 20-mile radius of Terre Haute. What we discovered during this case was that faxes went to the Chicago area, faxes went to Cleveland, Ohio. A few faxes went to the Pittsburgh area. I think one fax even went to New York City. And clearly, this is well outside the area that Mr. Clark had done business. The evidence also established, and I think this is in the finding of fax, that he had never done business in the Chicago area or really anywhere outside the local Terre Haute area. Did these people to whom this was sent have some sort of a common? Were they all nursing homes? Who was the target audience? It's interesting because if you look at least within the Terre Haute, there were pharmacies. I think there was a Kroger store that it was sent to. There was an Osco drugstore that faxes were sent to. In addition, there was, I think, a couple of either nursing homes or extended care type facilities that they were sent to. So I think it was basically somewhat aligned with the medical industry, whether it was pharmacies or whether it was... Well, supposedly somebody couldn't hear very well. Supposedly somebody couldn't hear very well. Yeah, someday I'm going to have to call him up maybe. But in any event, I'm trying to figure out why they went to 4,000 or 6,000 people. Well, and that's a good question. I think what happened was that B2B basically couldn't find, or whatever they did, they didn't find enough people to send it to, and they ended up sending however many faxes on their own. What's this Romania situation? What happened is that this woman, Caroline Abraham, worked in Brooklyn, New York. Ms. Abraham had a relationship, kind of a secretarial relationship, with Business to Business Solutions. So they would do the solicitation of potential customers, and they would obtain the... They would provide instructions to Romania. And then Romania then in turn would use Business to Business's computer equipment to send out the faximiles. And so it's kind of a strange relationship. But, I mean, B2B was essentially the front person with respect to all of the customers. But nobody's ever sued B&B, B&B or whatever it is. You know, I don't know if that's necessarily correct. I think B2B may have been sued in a couple of the cases that were brought by plaintiffs' counsel in this lawsuit. In this lawsuit, they weren't sued. But I think B2B is out of business, and there's really no point going after... Is your client still in business? My client still is in business. But he had to pay $16,000. That's correct. That's better than $2.4 million, though. That's what you multiply. Yeah, if you go by 500 times, I think there were about 4,800 faxes. But what I want to address is a couple of issues with respect to our cross-appeal. And this presents somewhat of a procedural dilemma because Judge Valdez ended up, in March of 2013, entered summary judgment in favor of the 32 facsimiles going to 24 individuals within the 20-mile radius of Terre Haute. We did not dispute that. There was some discussion as to how that methodology was computed, and Judge Valdez addressed that. And neither of the parties here are contesting that the 32 faxes went within this 20-mile radius. And it had been noted there were 24 such recipients. The issue, then, is that we objected to the entry of any judgment in favor of a subclass because no subclass has ever been certified. The case was filed with one unified class. Motion for class certification was a certified one class. Plaintiff's motion for summary judgment sought judgment as to the class that was certified. And we had submitted to the district court that you can't enter a judgment if you don't have a subclass. And I think that the motion objected to the entry of judgment in favor of the 24 recipients because there had been no subclass certified. No representative party. No representative party at that point. This could have easily been remedied had plaintiff's counsel sought to bring in somebody with respect to the Terre Haute group, if you will. The other problem with the Terre Haute group... Can I stop you? Sorry. Forgive me. Because time is so short. Maybe you can explain this to me. How does it benefit ADH to decertify the class post-judgment? You won against 99% of the plaintiffs. That means they are bound by that adverse judgment. Why would you want to decertify when you prevailed against 99%? It seems to me that your client really dodged a bullet here. A $2.4 million bullet, I might add. Why put that in jeopardy to try to save $16,000? I've been banging my head. This is an issue that I have struggled with, to say the least. And we have a situation where you have the two groups of people, the Terre Haute group and the other group. The Terre Haute group, aside from not having a class representative, probably did not have numerosity. There were only 24 members. But, you know, I understand what you're saying. I think there is preclusive effect under res judicata. I think possibly if somebody else had come and attempted to sue, there may be a collateral estoppel issue there. But I understand what you're saying. The real problem that was created was when the magistrate judge entered judgment in favor of an unrepresented subclass. And I've struggled with how we deal with this. Well, all that would need to be done, it seems to me, is remand and a new judgment order. Well, if you're going to enter a judgment order, you need a class representative that has a claim. You would also need to establish numerosity. And one of the cases that we cited was the Kenevan case. I believe it's out of the Southern District of New York. And what they ended up doing in that case is they found against the without prejudice the claims of the number of... Why isn't Bridgeview an adequate representative for plaintiffs within the 20-mile radius? It won the case for those plaintiffs. And it won on summary judgment for those plaintiffs. Yet after the fact, you seem to want to argue they were not adequate. And I don't know. To me, that suggests that a plaintiff, that a named plaintiff, any time a named plaintiff loses in a class action but wins for other members of the class, the court should decertify. And that would obliterate the benefit of class actions for defendants. I understand that. But this is kind of a weird case from a procedural standpoint because you have basically two groups of plaintiffs. You have the Terre Haute group of plaintiffs and Bridgeview does not fall within that radius. The problem could have probably been resolved had a subclass been certified. But I think in this case, maybe the better course of action is to let the judgment stand and dismiss without prejudice the claims of the 24 entities. And if they can either file individual claims or they can seek to file it as a class action. But it's a strange procedural case. And I'm not sure what would have happened had Judge Valdez concluded that, for example, under 56G, the fact as to the 32 faxes was not going to be in dispute at trial.  And that kind of puts us in a procedural mess, if you will. Can we remand to see what members of the class have valid claims? Well, the members of the class that have valid claims are those 24 recipients. And you could remand and give them an opportunity, for example, to either issue an individual claim or to attempt to get a subclass certified. But because of the numbers within the subclass, I think the problem that exists is whether or not you're going to be able to satisfy the numerosity requirements of Rule 23. And if I may, unless the panel has more issues on this, I'd like to at least briefly turn to the principal appeal that was filed by Bridgeview. Yeah, well, that's the elephant in the room, so to speak. That is the elephant in the room. And with respect to counsel's suggestion that this is strict liability, they've relied upon the Saris case, which is out of Florida, District Court in Florida. They've also cited a number of other cases. And of interest in the Saris cases is that case involved a dentist who hired a third-party marketer. The third-party marketer then turned around and hired B2B to send out faxes advertising the dental practice. It appears from the fax in that case the final ad was never approved. Nonetheless, B2B ended up sending out faxes all over the places it seems to be their custom. And the 11th Circuit ended up requesting from the FCC an opinion as to how, you know, what type of liability there is under the TCPA for senders and whether it was direct liability or vicarious liability. And what the FCC ended up saying is a sender is the person on whose behalf a facsimile is sent. Saris did not stand for the proposition that a sender is liable for every facsimile that is sent. And if it were that type of situation, what would have happened is that judgment should have been entered on behalf of the plaintiff in that case. There are two cases the plaintiff cited as supplemental authority. Neither of those cases stand for the absolute proposition of strict liability. One case we cited was Sinclair-Hugh Automobiles and Helping Hand. Both those cases coincidentally were plaintiff's counsel was involved in those cases. In their response to our opening brief, plaintiff's counsel didn't even address those particular issues. But in Helping Hand and in Sinclair-Hugh, per se liability was rejected. In Sinclair-Hugh, as Magistrate Judge Valdes did in this case, she looked at the totality of the circumstances. Some of those involved vicarious liability, but the Sinclair-Hugh case had, I think, eight factors that the court would look at in determining whether or not a person is a sender under the TCPA. In addition, Judge Valdes did the same thing. She used five factors, but for the most part, what Judge Valdes said is it's somewhere between absolute liability and vicarious liability, and she ended up using an enhanced standard. And I think that's probably appropriate in this case. The plaintiff in this case has taken the, you know, it's a line in the sand. Either if you're a sender, you're liable for everything. And Judge Valdes, I think, took a far more measured approach and looked at all of the facts and all of the circumstances. And none of the cases that the plaintiffs have cited have ever, ever held that there is a per se liability, sender liability. Is it vicarious liability? You know, that's a good question, Your Honor. Probably won't ask too late, actually. Yeah. It's somewhat more of an enhanced review than a straight vicarious liability, but by all accounts, you need to take into account the principles of vicarious liability. What kind of instructions you would have given to the — Did anybody plead that? It was not pleaded. But, you know, the FCC basically has said it's really not vicarious liability. It's a direct liability. And, again, in analyzing it, you know, our position is Judge Valdes was correct in viewing the totality of the circumstances, and the totality of the circumstances established that the facts set outside this 20-mile radius of Terre Haute were not set on behalf of Clark. So I see my time is up. I don't know if the judges have any more questions. And with respect to the remaining issues, I think there was the interrogatory answer. We'll just stand up and read because I think it's out there. Thank you. I just lost the picture. Briefly, Your Honor, you asked if anybody pleaded vicarious liability. We did plead. The facts were sent by or on behalf of them. In the Palm Beach v. Saris case, which is an 11th Circuit opinion, it's not set as a district court opinion. It's not. It's an 11th Circuit opinion. There the court reversed summary judgment when the judge there had said, the plaintiff failed to plead vicarious liability. The 11th Circuit sent a letter requesting a response from the FCC. They sent one. The FCC said, no, it's not vicarious liability. It's direct liability. It's on the sender. The sender is defined as the guy whose stuff is advertised. But we did plead on behalf of him. This idea that Mr. Clark is going to pay $16,000 or whatever, he's not going to pay anything. He's insured for the whole thing. And counsel knows that when he kind of plays on the court's sympathy, like this poor guy, the hearing aid business or whatever, we filed and won in the Illinois Supreme Court a declaratory judgment that he's covered by State Farm. So that's good news for him. Did they say they don't have that disclaimer in their policy? Yeah, they have all the disclaimers. But whatever they were in this particular case, they weren't binding. And he is covered according to the Illinois Supreme Court. Because I know we had that other one where it was binding. Is that right, Carl? Exactly. Yeah, you're right. There have been different. But in this case, no. The idea that the guy only sells, you know, a lot of businesses start out in Terre Haute and they hope to grow bigger. On Amazon.com you can buy hearing aids and hearing things and everything, and they're not in Terre Haute. So the idea that the guy only wants, and his whole aspiration is only have business in 20 miles, really close. Not even close to his house is outside 20 miles. His other business location is outside 20 miles. Some of his customers are outside 20 miles. But at trial, no, it's all about this little 20-mile business. Well, that's what the district court found, though, right, Mr. Bach? Well, after she applied the wrong standard, Your Honor, then she decided that that story was horrible, even though we couldn't ask it. Well, aside from the standard, that was his representation, and she concluded that was truthful, right? Yeah, I guess so, yeah. I mean, I appreciate the right standard, but we can't present her conclusion that that's what we wanted. I understand. There's a feeling that this case is unfair because this poor little guy just wanted to send some taxes for $3 apiece to only his local companies, but he doesn't even want to know who they are, and now he's getting hit with all this liability. And it's like, no, he's insured. He sent thousands. The company told him in writing it'd be thousands. He didn't see those. And the judge didn't even let us attack his credibility in a one-day bench trial where the only issue was that. So he's insured for the next millions? Possibly. Possibly, okay. Probably not. Now they're all excluded. Insurance companies are on to this. Yeah, well, they excluded him and everything. But, I mean, there are at least three types of statutes like this. Correct, yeah. So there's a lot of room. I know you guys are busy. Well, we try to find a way that he's covered. Mr. Brock, your time. Okay, thank you. All right, thanks to both counsel. The case is taken under advisement.